**NATIONAL–STANDARD COMPANY,**
Plaintiff,

v.

**CLIFTON AVENUE CORP. and Hartz Mountain Industries, Inc., Defendants.**

Civ. A. No. 90–2686.

United States District Court,
D. New Jersey.

Aug. 2, 1991.

Jan Alan Brody, Carella, Byrne, Bain, Gilfillan, Cecchi & Stewart, Roseland, N.J., for plaintiff.

Justin P. Walder, John A. Brogan, Jeffrey A. Walder, Walder, Sondak, Berkeley & Brogan, Roseland, N.J., for defendants.

## OPINION

LECHNER, District Judge.

This is an action brought by National–Standard Company ("National–Standard") against Clifton Avenue Corp. ("Clifton") and Hartz Mountain Industries, Inc. ("Hartz") (collectively, "Defendants") to enforce a real estate purchase contract. Jurisdiction is alleged pursuant to 28 U.S.C. § 1332 and appears to be appropriate.

Currently before the court is the motion of Defendants for summary judgment pursuant to Fed.R.Civ.P. 56.[1] For the reasons

---

1. The parties have submitted the following for consideration: Brief of Defendants Clifton Avenue Corp. and Hartz Mountain Industries, Inc. in Support of their Motion for Summary Judgment; Affidavit of Jeffrey A. Walder, Esq., in Support of Defendants' Motion for Summary Judgment; Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment; Affidavit of Rene J. Van Steelandt in Opposition to Defendants' Motion for Summary Judgment;

which follow, summary judgment is granted in favor of Defendants.

## FACTS

National–Standard is a corporation organized under the laws of the State of Delaware and maintains its principal place of business in Michigan. Clifton is a corporation organized under the laws of and maintains its principal place of business in the State of New Jersey. Hartz is a corporation organized under the laws of the State of New York and maintains its principal place of business in New Jersey.

On 2 August 1987, National–Standard and Clifton entered into a real estate purchase contract (the "Contract"). The Contract provided National–Standard agreed to sell to Clifton approximately thirty-five acres of real property (the "Property") located in Clifton, New Jersey. The purchase price of the Property was $10 million. A portion of the Property was used as landfill for wastes generated by National–Standard's commercial activities on the Property.

The Contract stated Clifton was a wholly-owned subsidiary of Hartz. Contract, art. XXIV. The Contract provided Hartz would pay National–Standard liquidated damages in the amount of $3 million in the event Clifton wilfully defaulted on its obligations under the Contract. *Id.*

On 11 July 1990, National–Standard filed its complaint (the "Complaint") bringing suit against Defendants. National–Standard brought suit to enforce the Contract on the grounds Defendants repudiated and anticipatorily breached the Contract. National–Standard alleges Defendants expressed an unwillingness to perform under the Contract because Defendants deemed the clean-up of the portion of the Property used as landfill to be unacceptable. Complaint, ¶ 15.

The amended answer and counterclaim (the "Def. Answer") was filed 4 March 1991. Defendants denied National–Standard's allegations and asserted numerous affirmative defenses and counterclaims. Of particular relevance to this opinion are the fourteenth affirmative defense and the fifth counterclaim.

In the fourteenth affirmative defense, Defendants assert the Complaint should be dismissed because National–Standard "failed to meet its statutory obligation under N.J.S.A. 13:1E–116 of disclosing in the Contract the prior utilization of the Property as a sanitary landfill." Def. Answer at 6. In the fifth counterclaim, Defendants seek recision of the Contract in part on the ground "National–Standard knew that the [Property] contained a sanitary landfill but failed to disclose same to [Clifton]. N.J.S.A. 13:1E–116 specifically requires a disclosure of the existence of a sanitary landfill in a contract for the sale of property containing such a landfill." *Id.* at 14.

National–Standard's answer to amended counterclaims (the "Plntf. Answer") was filed 26 March 1991. National–Standard asserted several affirmative defenses to the counterclaims, including laches, anticipatory breach, waiver, equitable and promissory estoppel and unclean hands. Plntf. Answer at 7.

## DISCUSSION

### A. Summary Judgment Standard of Review

 To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that [it] is entitled to

---

Affidavit of Richard W. Chapin, P.E. in Opposition to Defendants' Motion for Summary Judgment; Reply Brief of Defendants in Support of their Motion for Summary Judgment.

By letter, dated 18 July 1991, counsel to Defendants submitted a copy of the decision in *Johnson Machinery Co. v. Manville Sales Corp.,* 248 N.J.Super. 285, 590 A.2d 1206 (App.Div. 1991). At oral argument on 22 July 1991, the parties were granted leave to file submissions regarding the relevance of the *Johnson Machinery* decision. Accordingly, National Standard submitted: Plaintiff National–Standard Company's Supplemental Brief on the Effect of the Appellate Division Opinion in *Johnson Machinery Co. v. Manville Sales Corp., et al.* ("Plntf. Supp. Brief"). Defendants submitted a letter-brief ("Letter–Brief") in response. Defendants by letter, dated 30 July 1991, corrected several errors in the Letter–Brief.

judgment as a matter of law." Fed. R.Civ.P. 56(c). The present task is to determine whether disputed issues of fact exist, but a district court may not resolve factual disputes in a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *see Nathanson v. Medical College*, 926 F.2d 1368, 1380 (3d Cir.1991) (Summary judgment may not be granted "if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed."). All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *Boyle v. Governor's Veterans Outreach & Assistance Center*, 925 F.2d 71, 75 (3d Cir.1991); *Weldon v. Kraft, Inc.*, 896 F.2d 793, 797 (3d Cir.1990); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Todaro v. Bowman*, 872 F.2d 43, 46 (3d Cir.1989); *Joseph v. Hess Oil*, 867 F.2d 179, 182 (3d Cir.1989). " 'Any "unexplained gaps" in material submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment.' " *Ingersoll–Rand Fin. Corp. v. Anderson*, 921 F.2d 497, 502 (3d Cir.1990) (quoting *O'Donnell v. United States*, 891 F.2d 1079, 1082 (3d Cir.1989)).

Although the summary judgment hurdle is a difficult one to overcome, it is by no means insurmountable. As the Supreme Court has stated, once the party seeking summary judgment has pointed out to the court the absence of a genuine issue of material fact,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*' ... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'

*Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1356 (emphasis in original, citations and footnotes omitted). In other words, the inquiry involves determining " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Brown v. Grabowski*, 922 F.2d 1097, 1111 (3d Cir. 1990) (quoting *Anderson v. Liberty Lobby*, 477 U.S. at 251–52, 106 S.Ct. at 2511–12), *cert. denied sub nom.*, ——— U.S. ———, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991).

The Supreme Court elaborated on the summary judgment standard in *Anderson v. Liberty Lobby:* "If the evidence [submitted by a party opposing summary judgment] is merely colorable ... or is not significantly probative ... summary judgment may be granted." 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted). The Supreme Court went on to note in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986): "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Id.* at 323–24, 106 S.Ct. at 2553 (footnote omitted).

■ Once a case has been made in support of summary judgment, the party opposing the motion has the affirmative burden of coming forward with *specific* facts evidencing a need for trial. *see* Fed. R.Civ.P. 56(e); *see also Maguire v. Hughes Aircraft Corp.*, 912 F.2d 67, 72 (3d Cir. 1990) (non-moving party may not rest upon mere allegations); *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990) (neither unsupported allegations in pleadings and memoranda of law nor conclusory allegations in affidavits will establish genuine issue of material fact); *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1165 (3d Cir.1990) (cannot create issue of fact merely by questioning credibility of movant's witnesses; circumstantial evidence may raise issue of fact); *Aronow Roofing Co. v. Gilbane Building Co.*, 902 F.2d 1127, 1128 (3d Cir.1990) ("summary judgment will be granted where the non-moving party fails to 'establish the existence' of an element essential to the case");

*Carlson v. Arnot–Ogden Memorial Hosp.,* 918 F.2d 411, 413 (3d Cir.1990) ("nonmoving party must adduce more than a mere scintilla of evidence in its favor").

### B. Contractual Disclosure of Landfill Facilities

■ Defendants seek recision of the Contract on the ground the Contract failed to disclose under N.J.S.A. 13:1E–116 that part of the Property was used as a sanitary landfill. Section 13:1E–116 is part of the Sanitary Landfill Facility Closure and Contingency Fund Act (the "Closure Act"), N.J.S.A. 13:1E–100 *et seq.* Section 13:1E–116 provides, in pertinent part:

> a. *No person shall contract to sell any land* which has been utilized as a sanitary landfill facility at any time prior to the effective date of this supplementary act *unless the contract of sale for the land shall state the fact* and the period of time that the land was so utilized.
>
> . . . . .
>
> b. Any contract made in violation of this section is voidable.

N.J.S.A. 13:1E–116 (emphasis added). National–Standard "concedes for summary judgment purposes that it operated a sole source landfill as the depository for waste generated by its on-site commercial operation on the real property which is the subject matter of the instant action and that the real estate purchase contract does not include the required statutory language." Plntf. Supp. Brief at 2. Accordingly, the only issue which needs to be considered is whether a "sole source landfill" such as the one National–Standard concedes it operated on the Property constitutes a "sanitary landfill facility." This question was addressed in *Johnson Machinery Co. v. Manville Sales Corp.,* 248 N.J.Super. 285, 590 A.2d 1206 (App.Div.1991).

#### 1. *Johnson Machinery Co. v. Manville Sales Corp.*

The *Johnson Machinery* court was faced with the same question raised by Defendants: Whether the definition of a solid waste facility, which includes sanitary landfills, encompasses a noncommercial sole source landfill. 248 N.J.Super. at 297, 590 A.2d 1206. A noncommercial sole source landfill is a landfill which accepts only solid waste from a source on the site of the landfill and not from any other commercial sources. *Id.*

In *Johnson Machinery,* the purchaser of real property brought an action to void the purchase agreement in part on the ground the agreement did not contain a statement pursuant to N.J.S.A. 13:1E–116 that the property had been used as a sanitary landfill. 248 N.J.Super. at 288–89. The purchaser moved for summary judgment. The trial court denied the purchaser's motion in part on the ground section 13:1E–116 did not apply to a noncommercial sole source landfill. *Id.*

The purchaser appealed. The Appellate Division of the Superior Court of New Jersey (the "Appellate Division") reversed, stating:

> We hold that the term "sanitary landfill facility" in the Closure Act includes a sole source landfill which operates only as the depository of the waste its own commercial operation has generated. We also hold that the Closure Act means exactly what it says: [W]here sale property has been used as a sanitary landfill facility, the seller must include *in the contract* of sale a statement that the property has been so used and for what period of time. Failure to include this information will result in the contract being void at the sole discretion of the buyer. *No equitable defenses to the voiding of the contract are recognized.*

*Johnson Machinery,* 248 N.J.Super. at 290, 590 A.2d 1206 (emphasis added).

In reaching these conclusions, the Appellate Division first examined the Solid Waste Management Act (the "SWMA"), N.J.S.A. 13:1E–1 *et seq.,* which incorporates and therefore determines the scope of the Closure Act. *Johnson Machinery,* 248 N.J.Super. at 296, 590 A.2d 1206. The SWMA defines "sanitary landfill facility" as: "[A] solid waste facility at which solid waste is deposited on or in the land as fill for the purpose of permanent disposal or storage for a period exceeding six months,

except that it shall not include any waste facility approved for disposal of hazardous waste." N.J.S.A. 13:1E–3q; *see Johnson Machinery,* 248 N.J.Super. at 296–97, 590 A.2d 1206.

Under the SWMA, a "solid waste facility" is defined as:

> ... [T]he plants, structures and other real and personal property acquired, constructed or operated or to be acquired, constructed or operated by any person ... including transfer stations, incinerators, resource recovery facilities, *sanitary landfill facilities* or other plants for the disposal of solid waste, and all vehicles, equipment and other real and personal property and rights therein and appurtenances necessary or useful and convenient for the collection or disposal of solid waste in a sanitary manner.

N.J.S.A. 13:1E–3h (emphasis added); *see Johnson Machinery,* 248 N.J.Super. at 297, 590 A.2d 1206. "Solid waste" is defined as: "[G]arbage, refuse, and other discarded material resulting from industrial, commercial and agricultural operations, and from domestic and community activities, and shall include all other waste materials including liquids...." N.J.S.A. 13:1E–3a; *see Johnson Machinery,* 248 N.J.Super. at 297, 590 A.2d 1206.

In holding that the presence of a noncommercial sole source landfill must be disclosed in a real property purchase agreement, the Appellate Division first examined the language of the relevant statutes and the relevant legislative history. The Appellate Division noted: "Nothing in our research suggests that the commercial/sole source distinction ... was ever contemplated by the Legislature." *Id.* The Appellate Division then noted the SWMA was enacted to regulate all solid waste disposal activities and "[n]othing in the previously cited definitions suggests ... sole source landfills were meant to fall outside the broad reach of the SWMA." *Id.*

In addition, the Appellate Division noted that although the SWMA permits the Department of Environmental Protection (the "DEP") to exempt specific waste disposal activities from regulation, sole source land-fills were never exempted by the DEP. *Id.* at 297–98, 590 A.2d 1206. Moreover, "from the inception of its regulatory jurisdiction, DEP treated the 'intra-plant' land disposal of 'plant generated waste materials' as a 'sanitary landfill' subject to the 'registration, operation and closure maintenance' requirements of the SWMA and the agency's implementing regulations." *Id.* at 298, 590 A.2d 1206 (quoting N.J.A.C. 7:26–1.1).

The Appellate Division pointed out that non-commercial landfills had been exempted from regulation under SWMA in limited situations. *Johnson Machinery,* 248 N.J.Super. at 298–99, 590 A.2d 1206. Never, however, had sole source landfills been exempted. *Id.* From this, the Appellate Division drew the conclusion that the SWMA on its face encompassed non-commercial and sole source landfills. *Id.* at 299, 590 A.2d 1206. For non-commercial landfills to be entirely excluded from SWMA, either the New Jersey legislature or the DEP would have to expressly create an exemption. *Id.* No such exemption, however, has been created. *Id.*

Turning to the Closure Act, the Appellate Division noted the scope of the Closure Act is just as broad as the scope of the SWMA. *Id.* at 299, 590 A.2d 1206. The Appellate Division pointed out that neither the Closure Act nor the only New Jersey Supreme Court case interpreting the Closure Act indicated that noncommercial sole source landfills were excluded from regulation under the Closure Act. *Id.* at 300, 590 A.2d 1206.

The Appellate Division also examined the policy considerations behind regulating noncommercial sole source landfills under the Closure Act. The Appellate Division noted:

> ... [T]here is simply no basis to distinguish between sole source and ordinary commercial landfills. All landfills present an identical danger to the environment. That danger is not diminished because the solid waste comes from one source instead of many and there is no policy reason that we can discern why a sole source noncommercial industrial landfill should not be closed in the same

environmentally sound manner as is prescribed for all other landfills. Likewise, we see no reason why the operator of such a landfill should not be required to set aside funds for such closure and as compensation for innocent victims. In the absence of clear legislative direction to the contrary, there is no reason to exempt sole source noncommercial landfills from the operation of the Closure Act.

*Id.* at 302, 590 A.2d 1206. Accordingly, the Appellate Division reversed the trial court ruling that the disclosure requirement set forth in N.J.S.A. 13:1E–116 did not apply to noncommercial sole source landfills. *Id.* at 302–03, 590 A.2d 1206.

As a final matter, the seller in *Johnson Machinery* attempted to argue there is no absolute right to void a purchase agreement which does not contain the language required by N.J.S.A. 13:1E–116. 248 N.J.Super. at 307, 590 A.2d 1206. Rather, the seller argued equitable defenses might make such a purchase agreement enforceable, rather than voidable. *Id.* The Appellate Division, however, rejected this argument. The Appellate Division reasoned that permitting equitable defenses to make a purchase agreement enforceable rather than voidable would undermine the mandatory language of N.J.S.A. 13:1E–116. *Johnson Machinery*, 248 N.J.Super. at 308, 590 A.2d 1206. Accordingly, the power of a purchaser to void a real property purchase agreement which lacks the required disclosure under N.J.S.A. 13:1E–116 is not subject to equitable defenses. *Johnson Machinery*, 248 N.J.Super. at 308–09, 590 A.2d 1206.

2. *Applicability of Johnson Machinery*

■ The ruling of the Appellate Division in *Johnson Machinery* is dispositive. Because noncommercial sole source landfills are encompassed by N.J.S.A. 13:1E–116, the Contract had to disclose that National–Standard operated a landfill on the Property. It is uncontroverted that the Contract does not make such a disclosure. Accordingly, the Contract is voidable under N.J.S.A. 13:1E–116 at the election of Defendants.

Notwithstanding the fact that the issues in *Johnson Machinery* are identical to the issues in this action, National–Standard argues the ruling in *Johnson Machinery* should not be applied in this action. First, National–Standard argues the *Johnson Machinery* decision is not controlling because it is not a decision from the New Jersey Supreme Court. Plntf. Supp. Brief at 3. Second, National–Standard argues the holding in *Johnson Machinery* that the Closure Act applies to sole source landfills will be reversed by the New Jersey Supreme Court. Plntf. Supp. Brief at 5. Furthermore, National–Standard argues the holding in *Johnson Machinery* that the voiding of a contract under N.J.S.A. 13:1E–116 is not subject to equitable defenses will be reversed by the New Jersey Supreme Court. Plntf. Supp. Brief at 8. Third, National–Standard argues the *Johnson Machinery* decision should not be applied retroactively. Plntf. Supp. Brief at 11. Finally, National–Standard argues this summary judgment motion should be stayed pending appeal of the *Johnson Machinery* decision. Plntf. Supp. Brief at 18. Each of these arguments will be considered in turn.

a. Reliance on a State Court Decision

As mentioned, National–Standard argues it is inappropriate to rely upon the *Johnson Machinery* decision because that is not a decision of the New Jersey Supreme Court. Plntf. Supp. Brief at 3.

■ A federal court sitting in diversity must apply substantive state law. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938); *Yohannon v. Keene Corp.*, 924 F.2d 1255, 1264 (3d Cir.1991). Ordinarily, controlling state law will be that which is pronounced by the relevant state legislature or highest state court. *Erie*, 304 U.S. at 78, 58 S.Ct. at 822; *see Commercial Union Ins. Co. v. Bituminous Casualty Co.*, 851 F.2d 98, 100 (3d Cir.1988). When a particular question of law has not been authoritatively decided by highest state court, the federal court must predict what the highest state court would decide if confronted with the same question. *Yohannon*, 924 F.2d at

1264; *Aetna Casualty & Surety Co. v. Farrell,* 855 F.2d 146, 148 (3d Cir.1988); *McKenna v. Ortho Pharmaceutical Corp.,* 622 F.2d 657, 661 (3d Cir.), *cert. denied,* 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980).

■ In predicting how the highest state court would decide an issue, the federal court may look to analogous state court cases, treatises, restatements and law review articles. *McKenna,* 622 F.2d at 662–63. In addition, particular attention should be given to the decisions of intermediate state appellate courts. *Aetna Casualty,* 855 F.2d at 148; *Patterson v. American Bosch Corp.,* 914 F.2d 384, 391 (3d Cir. 1990); *Commercial Union,* 851 F.2d at 101; *McKenna,* 622 F.2d at 662.

It has been noted that " 'under some conditions, federal authority may not be bound even by an intermediate state appellate court ruling.' " *McKenna,* 622 F.2d at 662 (quoting *Commissioner v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1951)).[2] Decisions of intermediate state appellate courts, however, constitute "presumptive evidence of state law." *Commercial Union,* 851 F.2d at 101; *see Aetna Casualty,* 855 F.2d at 148 ("[G]ive serious consideration to the opinion of an intermediate appellate court."). Indeed, the decision of an intermediate state appellate court " 'is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise' " *Bosch,* 387 U.S. at 465, 87 S.Ct. at 1782 (emphasis omitted) (quoting *West v. A.T. & T. Co.,* 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940)); *see Patterson,* 914 F.2d at 391.

The *Johnson Machinery* decision is a compelling, well-reasoned decision by a New Jersey intermediate appellate court on the exact issue raised by Defendants. National–Standard concedes that if the ruling in *Johnson Machinery* is applied to the facts in this action, then summary judgment must be granted in favor of Defendants. Plntf. Supp. Brief at 2.

■ In *Aetna Casualty,* the court held that it was "obliged to accept" the decision of a New Jersey intermediate appellate court decision as controlling when the state court decision "represent[ed] a reasonable prediction of the rationale the state Supreme Court would adopt...." 855 F.2d at 150. Similarly, in this action, the *Johnson Machinery* decision is a reasonable (indeed probable) prediction of how the New Jersey Supreme Court would decide the issue of the applicability of the Closure Act to sole source landfills. The *Johnson Machinery* court considered and based its decision on New Jersey Supreme Court cases. *See Johnson Machinery, passim.* The *Johnson Machinery* decision is controlling.[3] Under New Jersey law, noncommercial sole source landfills are sanitary landfills which fact must be disclosed in a real property purchase agreement under N.J.S.A. 13:1E–116. *Johnson Machinery,* 248 N.J.Super. at 290, 590 A.2d 1206.

b. Reversal of Johnson Machinery

As mentioned, National–Standard contends the *Johnson Machinery* decision should not be deemed controlling because it will be reversed by the New Jersey Supreme Court. Plntf. Supp. Brief at 5–10. National–Standard relies on the trial court's decision in *Johnson Machinery* (which was reversed by the Appellate Division) as the proper interpretation of the Closure Act. Plntf. Supp. Brief at 5–7. National–Standard offers no other support for its proposition that the *Johnson Machinery* decision will be reversed. This argument is baseless.

The Appellate Division in *Johnson Machinery* examined the applicable legislative

---

2. In *Bosch,* the Court noted the decision of an intermediate state court would not control when the underlying issue of state law involves the construction of a federal statute. 387 U.S. at 465, 87 S.Ct. at 1782. In *Bosch,* federal tax statutes were implicated in a dispute involving state trust law. *Id.* at 459, 87 S.Ct. at 1779.

3. Even if the *Johnson Machinery* decision were not controlling, it would be persuasive authority which would support a ruling in this case in accord with the ruling of the Appellate Division.

history and case law. Indeed, the Appellate Division considered the same arguments made by National–Standard. There is no reason to discount the decision. National–Standard does nothing more than speculate that the *Johnson Machinery* decision may be reversed. Accordingly, the *Johnson Machinery* decision is controlling.[4]

c. Retroactivity

National–Standard contends the *Johnson Machinery* decision should not be applied retroactively to National–Standard. Plntf. Supp. Brief at 11.

■ Under New Jersey law, judicial decisions are, as a general rule, applied retroactively. *New Jersey Election Law Enforcement Comm'n v. Citizens to Make Mayor–Council Government Work*, 107 N.J. 380, 387, 526 A.2d 1069 (1987); *see Gruber v. Price Waterhouse*, 911 F.2d 960, 965 (3d Cir.1990) (presumption of retroactivity). The ruling in *Johnson Machinery* was applied to the facts before the *Johnson Machinery* court. Notably, the facts in the *Johnson Machinery* case are similar to the facts in this case in several significant aspects. The purchase agreement considered in *Johnson Machinery* was entered into in 1987, approximately four years before the Appellate Division held the Closure Act applied to sole source landfills. 248 N.J.Super. at 292, 590 A.2d 1206. In this case, National Standard and Defendants also entered into the Contract in 1987. Neither contract made the required disclosure. The Closure Act was enacted in 1981, approximately six years before the execution of both the purchase agreement in *Johnson Machinery* and the Contract between National Standard and Defendants. *See Vi–Concrete Co. v. New Jersey*, 115 N.J. 1, 13, 556 A.2d 761 (1989) (citing Sanitary Landfill Facility Closure

and Contingency Act (Closure Act), *L.* 1981, *c.* 306).

■ In essence, the Appellate Division in *Johnson Machinery* applied its ruling to an agreement executed approximately four years earlier. There is no reason the ruling in *Johnson Machinery* should not be similarly applied to the Contract, which was also executed approximately four years earlier than the Appellate Division decision. Because the relevant facts and contracts in this case and in *Johnson Machinery* are parallel, the Appellate Division holding that the Closure Act applies to noncommercial sole source landfills is applicable to the facts and Contract in this case.

A decision, however, may be limited to prospective application under certain circumstances. *Chevron Oil Co. v. Huson*, 404 U.S. 97, 106, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971); *Gruber*, 911 F.2d at 965; *Juzwin v. Asbestos Corp.*, 900 F.2d 686, 692 (3d Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 246, 112 L.Ed.2d 204 (1990); *Hill v. Equitable Trust Co.*, 851 F.2d 691, 695–96 (3d Cir.1988), *cert. denied sub nom.*, 488 U.S. 1008, 109 S.Ct. 791, 102 L.Ed.2d 782 (1989). As the Third Circuit stated in *Gruber*, the question whether a decision is to be applied prospectively only "involves a balancing which must be done on a case by case basis." 911 F.2d at 965. Under *Chevron*, three factors must be shown in order to overcome the presumption of retroactive application of newly created rules of law:

First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed. Second, it has been stressed that "we must ... weigh the merits and demerits in each case by looking to the prior history of the rule in

---

**4.** National–Standard contends the question of equitable defenses was improperly before the *Johnson Machinery* court. Plntf. Supp. Brief at 10. Whether this is indeed true is unclear. Nevertheless, the *Johnson Machinery* court fully and adequately considered the question of equitable defenses, giving due regard to the legis-

lative history of and policies behind the Closure Act. Accordingly, there is no basis to assume the New Jersey Supreme Court will reverse the *Johnson Machinery* court holding that there are no equitable defenses to the voidability of a contract which does not comply with N.J.S.A. 13:1E–116.

question, its purpose and effect, and whether retrospective operation will further or retard its operation." Finally, we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity." *Chevron,* 404 U.S. at 106–07, 92 S.Ct. at 355 (citations omitted); *see New Jersey Election Law Enforcement Comm'n,* 107 N.J. at 389, 526 A.2d 1069. "The burden of persuasion rests on the party attempting to avoid retroactive application." *Gruber,* 911 F.2d at 965.

National–Standard contends it "did not believe that [N.J.S.A. 13:1E–116a] applied to sole source landfills which operated only as the depository of the waste that its own commercial operation had generated." Plntf. Supp. Brief at 14. National–Standard contends it was reasonable for it to rely on its belief because there were no contrary interpretations of the Closure Act at the time the Contract was entered into. *Id.*

As mentioned, for National–Standard to meet the first prong of the *Chevron* test, National–Standard must show *Johnson Machinery* overruled past precedent upon which National–Standard reasonably relied. 404 U.S. at 106, 92 S.Ct. at 355. Alternatively, National–Standard must show that *Johnson Machinery* resolved an issue of first impression in a manner not clearly foreshadowed. *Chevron,* 404 U.S. at 106, 92 S.Ct. at 355. The absence of past interpretation, however, is not equitable to the past precedent upon which National–Standard would have to show it relied.

In addition, the holding in *Johnson Machinery* was foreshadowed by pertinent authority. As the Appellate Division noted in *Johnson Machinery,* the SWMA had always been interpreted to encompass the Closure Act and sole source landfills. 248 N.J.Super. at 299, 590 A.2d 1206. The Appellate Division concluded the New Jersey legislature "has expressed its view of the SWMA legislation as generally including sole source landfills and its approval of the long-standing DEP interpretation to that effect." *Id.* Therefore, the holding that sanitary landfills include sole source landfills was clearly foreshadowed.

National–Standard has failed to meet its burden of showing the first prong of the *Chevron* test is met. There is no need to consider the remaining prongs of the *Chevron* test. The principles pronounced in the *Johnson Machinery* decision are appropriately applied to the facts and Contract in this case.

### d. Stay Pending Appeal of Johnson Machinery

■ As mentioned, National–Standard argues discretion exists to stay this action pending the appeal of the *Johnson Machinery* decision. Plntf. Supp. Brief at 18. National–Standard indicates that the defendant in *Johnson Machinery* has applied to the New Jersey Supreme Court for review of the *Johnson Machinery* decision. Plntf. Supp. Brief at 19. There is no indication, however, whether the appeal will be heard. Accordingly, there is no reason to exercise the discretion to stay this action pending the appeal of the *Johnson Machinery* decision.[5] Moreover, even if certification is granted and the New Jersey Supreme Court reviews the Appellate Division decision, it is appropriate to anticipate an affirmance.

5. National–Standard relies upon *Kaiser Steel Corp. v. W.S. Ranch Co.,* 391 U.S. 593, 88 S.Ct. 1753, 20 L.Ed.2d 835 (1968), for the proposition that a federal court should defer resolving an issue grounded in state law until the highest court of the state decides the issue. Plntf. Supp. Brief at 18–19. In *Kaiser,* there was a declaratory judgment action pending in the state court at the same time as the federal court action was being litigated. 391 U.S. at 594, 88 S.Ct. at 1754.

In other words, a stay was proper in *Kaiser* because state court action was imminent. In contrast, the appeal of the *Johnson Machinery* decision has not been certified. It is unclear whether the *Johnson Machinery* decision will be certified. Consequently, there is no imminent New Jersey Supreme Court decision which would lend guidance to the issues raised in this case. Accordingly, a stay is inappropriate for that reason alone.

## CONCLUSION

For the reasons set forth above, the decision in *Johnson Machinery* is controlling. The Appellate Division explained the basis for its holding with compelling reasoning. Moreover, the decision is squarely in line with the intent of the explicit language and intent of the legislation: the disclosure and duration of environmental problems, or potential environmental problems, must occur in the contract of sale; a seller fails to do so at its own risk. Therefore, the Contract is voidable because it fails to disclose under N.J.S.A. 13:1E–116 that a sanitary landfill exists on the Property. There are no equitable defenses to the voiding of the Contract under N.J.S.A. 13:1E–116. Accordingly, summary judgment is granted in favor of Defendants. National Standard is to return to Clifton all deposit monies, plus accrued interest at the rate set forth in Article II of the Contract. The remainder of this action is dismissed.